USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1443 EUGENE ANDERSON, Plaintiff, Appellant, v. BOSTON SCHOOL COMMITTEE, ET AL., Defendants, Appellees. ____________________ No. 96-1578 EUGENE ANDERSON, Plaintiff, Appellee, v. BOSTON SCHOOL COMMITTEE, ET AL., Defendants, Appellants. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on February 3, 1997, is corrected as follows: Page 19, delete the last sentence of the opinion. Replace it with the following: Costs in No. 96-1443 awarded to the School ______________________________________________ Committee and O'Neill. _____________________ United States Court of Appeals For the First Circuit ____________________ No. 96-1443 EUGENE ANDERSON, Plaintiff, Appellant, v. BOSTON SCHOOL COMMITTEE, ET AL., Defendants, Appellees. ____________________ No. 96-1578 EUGENE ANDERSON, Plaintiff, Appellee, v. BOSTON SCHOOL COMMITTEE, ET AL., Defendants, Appellants. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Matthew Cobb with whom Paul F. Wood was on brief for Eugene _____________ _____________ Anderson. Michael C. Donahue with whom Malcolm Medley and Kevin S. _____________________ _______________ _________ McDermott were on brief for Boston School Committee, et al. _________ ____________________ February 3, 1997 ____________________ -3- COFFIN, Senior Circuit Judge. These are two consolidated _____________________ appeals. One is brought by plaintiff Eugene Anderson, a Boston public school teacher, contesting directed verdicts on all seven claims he brought against his then principal, Thomas P. O'Neill, Jr., and the Boston School Committee. In the other, the defendants appeal from the district court's denial of sanctions and an attorney's fee award. In the plaintiff's appeal, we affirm the judgment. In the defendants' appeal, we deem this a case where we feel we need the reasoning of the district court and so remand. I. Plaintiff's Appeal: The Merits At this juncture, there are directed verdicts on seven counts which are contested by plaintiff1, as well as several evidentiary rulings. The litigation resulted in over 100 docket entries from complaint to filing the notice of appeal and five days of jury trial, at the end of which the court granted  ____________________ 1 The counts and the affected defendant(s) are as follows: I. Racial discrimination (equal protection), 42 U.S.C. 1983, against O'Neill. III. Racial discrimination, Title VII, 42 U.S.C. 2000e et seq., 1964 Civil Rights Act, against the School Committee. IV. Racial discrimination, Mass. Gen. Laws ch. 151B, against the School Committee. V. Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, 11(H),(I) against O'Neill. VI. Libel and Slander, against O'Neill and the School Committee. VIII.Malicious Prosecution, against O'Neill. IX. Intentional Infliction of Emotional Distress, against O'Neill.  -3- defendants' motions for directed verdict. We have meticulously reviewed both the transcript and the exhibits. The smoke now dissipated, we are compelled to conclude that there is no longer any discernible fire. In view of the fact that such ample opportunity was afforded below to pursue all avenues in support of the claims, we do not feel it incumbent on us to replay all of the evidence. We shall content ourselves with a capsule summary of events and a brief consideration of the viability of each claim as of the end of the evidence. Factual Background. Plaintiff, a black person,2 had been a __________________ public school teacher for ten years when, in 1989, he drew an assignment as an art teacher to the Solomon Lewenberg Middle School in Mattapan, of which O'Neill was the principal. There was an obvious miscommunication, for when plaintiff appeared, O'Neill felt that there was no vacancy because another teacher, Molloy, a white person, had already filled it. He sent plaintiff back twice, but plaintiff finally was placed in the school, in addition to Molloy, and given an adequate room, only to be reassigned to a less satisfactory room shortly after.3 He also had trouble obtaining adequate art supplies. Soon after arrival at the school, plaintiff was asked to attend an orientation meeting; when he arrived, O'Neill accused him of breaking a lock  ____________________ 2 The parties use both the terms "black" and "African American;" we will use "black" here for the sake of ease.  3 The room had no storage closet, but did have an open storage area. It was large, well-lighted by windows, and had a wall length blackboard. -4- at the art room. In fact, plaintiff said, there was a door hinge without any lock on it. Apparently there were no consequences to this incident. Later in September and in October, O'Neill visited two of plaintiff's art classes for 45 and 55 minutes and prepared evaluations of his teaching. Plaintiff was criticized for his lesson planning, classroom management, and maintaining a learning environment, but was given satisfactory ratings for other factors such as use of materials, treatment of students, and professional cooperation Plaintiff responded vigorously to both evaluations. O'Neill was on leave during the 1990-1991 school year during which time Anderson had one satisfactory evaluation by another superior. In September of 1991, when O'Neill had returned, he summoned plaintiff to a formal hearing concerning an incident when Anderson appeared at school, allegedly with alcohol on his breath, detected by the assistant principal, Philogene, a black person, by another superior, Giacalone, and by others. For this he was given a warning. Later, in December of 1991 and January of 1992, O'Neill issued two more evaluations, giving many "unsatisfactory" ratings and noting that students in plaintiff's class were using foul language, playing cards, and reading comics. Finally, on January 24, 1992, O'Neill was visited in his office by three black girl students who wanted to talk to him about Anderson's behavior. Two of them complained that plaintiff had made sexual advances to them by touching them and by making -5- inappropriate remarks. The third stated that she had observed such conduct. They also said that he had made unwanted telephone calls to them at home. O'Neill then consulted with the office of the East Zone Superintendent of the Boston Public Schools, Clifford B. Janey, the city's General Counsel, and the Department of Safety. Janey, a black person, in turn instructed O'Neill to conduct a full investigation. This was undertaken, although there is no evidence detailing how it began, how the police were involved, or what steps were taken. In early February, plaintiff was relieved of his duties and transferred pending hearing and resolution. A criminal complaint was later filed after a show cause hearing. A bench trial in the spring of 1993 resulted in a judgment of guilty, but later a jury trial in December resulted in a not guilty verdict. This suit was filed shortly thereafter. Analysis:  ________ Racial discrimination. We first consider the claims of _____________________ racial discrimination, which are embraced by Counts I (42 U.S.C. 1983), II (42 U.S.C. 2000e et seq.), and IV (Mass. Gen. Laws ch. 151B). The striking fact about this case is that after all of the discovery and five days of trial, no evidence of either pretext or racially motivated discrimination was presented for jury consideration. No conversations evidencing racial animus were presented, nor any instances of unexplained more favorable treatment of similarly situated whites. There was no evidence that the accusations of lock breaking or of appearing at school -6- under the influence of alcohol were racially motivated or even initiated by Principal O'Neill. As for the evaluations, they could possibly be viewed by a jury as stemming from too rigorous a sense of management, order, and discipline, but there is no racial innuendo in O'Neill's extensive notations, discussions, and suggestions for improvement. Indeed, plaintiff acknowledges all this in his motion for a new trial, where, in arguing that the court erred in excluding evidence of the subsequent in-house handling of sexual harassment claims against two white school employees, he argued: "The admission of this evidence would have provided the 'race' that the Court was looking for at Directed Verdict." Unless the exclusion of this evidence was reversible error, the charges of racial discrimination must be held not to be supported by evidence sufficient to reach a jury. The evidence proffered was that, six months after the complaints against plaintiff, two white Lewenberg School employees were accused of inappropriate sexual conduct involving female students. (A custodian was accused of kissing a student, and a shop teacher was accused of telling a student, found hiding under a stairway, that she would have to "kiss the teacher" before she would be let out.) In both instances, the complaints were handled without involving the police, through meetings with the students, the employees, a parent, and a guardian. Plaintiff argues that O'Neill's failure to call in the police and to require signed statements, and his personal meeting -7- with the students and parents contrasts sharply with what took place after the complaints were lodged against plaintiff. Plaintiff faces the considerable hurdle of establishing an abuse of discretion by the district court in excluding the evidence. That court's basic determination was that plaintiff had not carried his burden of showing that the white employee cases were "similarly situated" to that of plaintiff, in order to lay a basis for the admission of the evidence. In the first place there is no evidence that there was any precise policy that mandated a specific course of action that in practice was applied differently to whites and blacks. Certainly the manner in which O'Neill sought and followed guidance in following up on the complaints against plaintiff does not suggest any predisposition to treat plaintiff any differently from anyone else found in his predicament. But, most pertinently, a simultaneous complaint by three female students involving touching, suggestive remarks, and observation of other such conduct, together with unwanted telephone calls at home, would seem to involve a demonstrably different order of magnitude than the solitary charges against the two white employees. See Perkins v. Brigham & Women's Hosp., ___ _______ _______________________ 78 F.3d 747, 751 (1st Cir. 1996). Moreover, there is no indication that any changes in approach had been invoked subsequent to the January complaints. We conclude that the district court did not exceed its discretion in excluding the evidence.  -8- Libel and Slander. Plaintiff relies heavily on the four __________________ performance evaluations made by O'Neill to make out a jury case of defamation. But these, as well as statements concerning plaintiff's breaking a lock and his "erratic" behavior, are subject to the qualified privilege of an employer or supervisor to monitor, discuss, and attempt to improve subordinates' performance. Much of what plaintiff complains about was not contested. Much was obviously the Principal's opinion as to what was good or bad educational practice. But none of it could have been found to have been knowingly false or in reckless disregard of the truth. Judd v. McCormack, 535 N.E.2d 1284, 1289 (Mass. _____ _________ App. Ct. 1989) (reversing for failure to direct a verdict even though "tasteless and harsh" language was used); Bratt v. _____ International Business Machines Corp., 467 N.E.2d 126, 131-32 _______________________________________ (Mass. 1984). Massachusetts Civil Rights Act. Under Mass. Gen. Laws ch. ______________________________ 12, 11(H)(I), interference with rights of another "by threats, intimidation or coercion" gives rise to a cause of action. These predicate words have been sternly construed by the Massachusetts Supreme Judicial Court. "Threat" involves an "intentional exertion of pressure to make another fearful . . . of injury or harm." "Intimidation" involves "putting in fear for the purpose of compelling or deterring conduct." And "coercion" involves the "application to another of such force, either physical or moral, as to constrain him to do against his will something he would not -9- otherwise have done." Planned Parenthood League of Massachusetts __________________________________________ v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). _____ Nothing in the evidence remotely suggests pressures of these magnitudes being brought to bear on plaintiff. Even his own self-serving testimony on cross examination that one of the complainants against him, April Allen, told him that O'Neill in talking with her twice said that he had seen plaintiff touching her, contrary to her own supposed belief, falls far short of indicating any such pressure on her which could forcefully impact on him. Malicious Prosecution. Plaintiff contends that he has ______________________ fulfilled the two threshold requirements of malicious prosecution: initiation of criminal proceedings with malice and without probable cause, and termination of such proceedings in his favor. He fails on both counts. First, there is no evidence of precisely how the criminal proceedings were initiated. As the Massachusetts Appeals Court noted in Ziemba v. Fo'cs'le, Inc., ______ ______________ 475 N.E.2d 1223, 1226 (Mass. App. Ct. 1985), even the act of calling the police is not the equivalent of instituting criminal proceedings. It may well be that such a decision was made by the police themselves. Equally important, the fact that the bench trial, unimpeached by any evidence of perjury by defendant O'Neill (who did not testify at either the show cause hearing or the bench trial), or of subornation of perjury, resulted in a judgment of guilty is a complete bar to the action. Della Jacova v. Widett, ____________ ______ -10- 244 N.E.2d 580, 582 (Mass. 1969). It should not be necessary to add that plaintiff's testimony of an alleged statement by his accuser April Allen concerning O'Neill's supposed statements that he had seen plaintiff lay hands on her, may not be dignified as evidence of subornation of perjury. Intentional Infliction of Emotional Distress. Again, the ______________________________________________ Massachusetts Supreme Judicial Court has sharply circumscribed the reach of this tort. In Sena v. Commonwealth, 629 N.E.2d 986, ____ ____________ 994 (Mass. 1994) the court stated that to sustain a claim of intentional infliction of emotional distress, a plaintiff must show 1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; 2) that the defendant's conduct was extreme and outrageous; 3) that the defendant's conduct caused the plaintiff's distress; and 4) that the plaintiff suffered severe distress. Id. (citing Agis v. ___ ____ Howard Johnson Co., 355 N.E.2d 315, 318 (Mass. 1976). The Agis __________________ ____ court cited approvingly such language as "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." 355 N.E.2d at 319. However one may view any of the actions attributable to Principal O'Neill, one could not fairly apply any of these rubrics to them.  Evidentiary Issues. Of the three evidentiary issues argued __________________ by plaintiff, we have already disposed of one, the court's exclusion of the evidence concerning the handling of the sex harassment complaints against the two white employees. A second involves the granting of defendant's motion in limine to exclude -11- April Allen's statements about O'Neill's conversation with her. But, as our above discussion reveals, the same testimony came in on the cross examination of plaintiff. We see no need to revisit in any detail what was already exposed.  The last claim is simply that the court excluded evidence that early in 1992 O'Neill called into his office the proffered witness, a former male student, and another who was accused of improper conduct and made them sign statements he had prepared. Plaintiff sees this incident as evidence of O'Neill's modus operandi. But O'Neill is not alleged to have engaged in any such conduct in this case; his supposed statements to April Allen of what he said he saw are of an obviously different modus than calling a student into his office and forcing the signing of a previously prepared written statement. The evidence would have little relevance, if any, but would have been freighted with prejudice. The court did not abuse its discretion. II. Defendants' Appeal: Fees and Sanctions Principal O'Neill and the School Committee appeal from the court's denial of their motions for sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. 1927 and for attorney's fees and costs under 42 U.S.C. 1988. The procedural background is brief. In their answers to the complaint, in early 1994, appellants invoked violation of Rule 11. Nothing transpired on the sanctions front until April of 1995, when appellants sent counsel for Anderson a letter protesting the allegations and serving notice that, if trial were -12- to take place, they would pursue their Rule 11 remedy. The next event took place on February 27, 1996, shortly after the court had directed the verdicts, when appellants filed a new Rule 11 motion. This, however, was filed without having waited for 21 days after service before filing, as required by c(1)(A) of the rule. It was denied on March 15 and on March 18 an amended motion, with additional allegations, was served; it was filed on April 16, 1996. In mid-March motions were filed under 1927 and 1988. All were denied by the court without hearing or comment in late March and early April. Appellants base their claims for sanctions on what they term unfounded and uninvestigated allegations of race discrimination on the part of O'Neill; allegations of systemic underrepresentation of blacks in Lewenberg School and elsewhere, together with discriminatory policies and customs resulting from reckless indifference on the part of the city and the School Committee; misleading and erroneous damages evidence on the part of Anderson; and allegations of false accusations of alcohol and drug abuse, coercion of young female students, and perjury on the part of O'Neill. Anderson merely presents the same facts in haec verba from his main brief, reargues that the district court was in error in directing the verdicts, contends that he had established prima facie cases on every count, and points out that he dismissed claims for disparate impact and municipal (Monell) liability. He ______ cited no cases. He dismisses appellants' motions as -13- "incomprehensible, not timely, violating every 'safe harbor' rule known, and, generally, . . . a waste of everybody's time." The questions which this background presented to the court involved the procedural one of timeliness and undue delay of the various motions and the substantive ones whether reasonable inquiry was made by plaintiff's counsel, Ryan v. Clemente, 901 ____ ________ F.2d 177 (1st Cir. 1990), and whether claims were unfounded or were so revealed as the case progressed. The motions also implicitly involved the allocation of responsibility, if any existed, between plaintiff and his counsel. The only question which faces us at this juncture, however, is whether we have enough basis to affirm, to modify, or to reverse. We are therefore required to focus sharply on our own precedents in order to determine whether the district court in denying sanctions and fees in this case should have accompanied those decisions with some explanation. We tread very carefully in this area, for the district court is entitled not only to the ordinary deference due the trial judge, and additional deference in the entire area of sanctions, but extraordinary deference in denying sanctions.  Appellants make the broad argument, based on a blanket observation in Metrocorps, Inc. v. Eastern Mass. Junior Drum & _________________ _____________________________ Bugle Corps Ass'n., 912 F.2d 1, 3 (1st Cir. 1990), that, whether __________________ or not sanctions are ordered or denied, reasons must be given, if meaningful review is to be had. In Metrocorps, sanctions were __________ sought because of a party's failure to comply with discovery -14- requirements. Fed. R. Civ. P. 37, however, specifies that sanctions may be avoided only if substantial justification is shown. We held that "[t]he clear language of the rule imposes a duty on the district court." Id. at 2. We also addressed the ___ alternative ground for sanctions, Rule 11, and cited Morgan v. ______ Massachusetts General Hospital, 901 F.2d 186, 195 (1st Cir. ________________________________ 1990), which in turn cited Carlucci v. Piper Aircraft Corp., ________ ______________________ Inc., 775 F.2d 1440, 1446-47 (11th Cir. 1985) for the general ____ proposition that a district court must state reasons so that a meaningful review may be had. We then went on to say, "[i]f this is the district court's burden when sanctions are imposed, it follows naturally that a similar obligation exists where, as here, sanctions are requested by one party, but denied by the court." 901 F.2d at 195.  But Carlucci itself not only addressed the unexplained ________ positive imposition of sanctions, but a discovery sanction under Fed. R. Civ. P. 37 limited to "reasonable expenses caused by the failure" to obey an order. Understandably, the appellate court felt it needed some basis on which to review the reasonableness of the amount. Moreover, in Morgan, where the hospital's motion ______ for fees had been denied without reasons, we prefaced our analysis with the observation that "From the record before us, we are unable to determine the basis of the district court's denial" of the motion. 901 F.2d at 195. We added that the fee decision "must both be explained and be supported by the record." Id. ___ These statements, of course, were sufficient to have justified -15- our action in requiring reasons, without resort to the Carlucci ________ blanket prescription. Later, in the same year, in Figueroa-Ruiz v. Alegria, 905 _____________ _______ F.2d 545, 549 (1st Cir. 1990), we remanded a case in which Rule 11 sanctions had been denied, because we found the decision to  be capable of bearing a number of meanings. We added:  While we do not hold that the district court must make findings and give explanations every time a party seeks sanctions under Rule 11, we do require a statement when the reason for the decision is not obvious or apparent from the record. We then cited, with a see, Morgan. ___ ______ Then came Metrocorps, with no reference to Figueroa-Ruiz. __________ _____________ Finally, in Witty v. Dukakis, 3 F.3d 517 (1st Cir. 1993), where _____ _______ the district court had, early on, denied a fee application under 1988 as untimely, and later denied without opinion two subsequent motions to revisit the issue, we said: So long as a district court's reason for denying fees or monetary sanctions is (1) well founded, (2) sufficient to the stated end, and (3) apparent on the face of the record, a reviewing tribunal will not insist on unnecessary punctilio. (Citing, among others, Figueroa-Ruiz and Morgan, but not Metrocorps.) Id. at _____________ ______ __________ ___ 521. We observed that it was "perfectly clear that the district court's thinking had not changed" between the first and last two decisions. Id. ___ From these precedents, we discern the continuing basic theme that although the rationale for a denial of a motion for fees or sanctions under Rule 11, 1927, or 1988 should be unambiguously communicated, the lack of explicit findings is not fatal where  -16- the record itself, evidence or colloquy, clearly indicates one or more sufficient supporting reasons. The occasional statements referring to an inflexible requirement for explicit findings in every case do not reflect our present considered judgment. Reflection reveals that appellate review of denials of such motions calls for somewhat more restraint than review of positive actions imposing sanctions and shifting fees. In the latter event the decision of the trial court is a relatively rare and always deliberate event. In the former event, motions are often perfunctorily made and generally denied. To require in run-of- the-mill cases, where it is obvious that the conduct of a party and his attorney was within the bounds of reason, decency, and competence, that the trial court stop and frame specific findings would be to add irresponsibly to its already considerable burden. In this case, however, a number of factors coalesce to convince us of the need for help from the district court. In the first place, we need its assessment of the weight of arguments as to untimeliness and undue delay in the pursuit of Rule 11 sanctions. We are also unable to ascertain without such help whether "reasonable inquiry" was made of some of the charges levied by plaintiff. Should available public records have indicated an absence of systemic recklessness and discrimination in the Boston school system? Were the alleged victims (Allen and O'Connor) of plaintiff's advances interviewed? Why were they, although present at the courthouse, not called as witnesses by plaintiff? Similar questions are raised in our minds as to -17- Stutman, the union representative, Philogene, who initiated the complaint of alcohol abuse, other teachers, police and the Department of Safety. Were plaintiff's explanations concerning the missing tape consistent and credible?4 Finally, what weight should be given, if any, to prior court-administered warnings to counsel. One was our own case, Cummings v. Hanson, 1995 U.S.App.Vol.LEXIS 36978 (December 1995), _________ ______ in which we affirmed sanctions against this plaintiff's attorney for bringing a claim in the wrong forum and cautioned him against repetition. And although the Massachusetts Appeals Court decision in Doe v. Nutter, McClennen & Fish, 668 N.E.2d 1329, ___ _________________________ 1331 (41 Mass. App. Ct. 1996), affirming sanctions and awarding double costs against plaintiff's counsel in the instant case for a frivolous appeal, was issued subsequent to the actions of the district court below in denying sanctions, both a Massachusetts Superior Court justice and a single justice of the Massachusetts Appeals Court had previously imposed sanctions against plaintiff's attorney for filing suit against defendants although he was aware that he did not have a viable cause of action. In raising these points, we do not profess to have an informed opinion. Indeed, that is why we feel it necessary to remand the case so that the district court may review its  ____________________ 4 Anderson claimed at one point to possess a tape recording of April Allen telling him that O'Neill was trying to get him in trouble; however, Anderson was unable to produce the tape, and indeed was inconsistent about the exact contents of the tape as well as about the identities of those for whom he had played it. -18- decisions on the several motions for sanctions and fees, assess any responsibility as between plaintiff and counsel, and make known to us its reasons for the actions taken. In the appeal on the merits (No. 96-1443), the judgment is affirmed.  In the fee appeal (No. 96-1578), we adopt the procedure of presently retaining jurisdiction and remanding to the district court for the limited purpose of revisiting the motions for sanctions and fees. Cf. United States v. Quinones, 26 F.3d 213, ___ _____________ ________ 219 (1st Cir. 1994).  The court may either (a) vacate the judgment and conduct such proceedings as it deems necessary to reach a final conclusion or (b) reaffirm the judgment previously imposed, filing with the clerk of the district court its written rationale. The court may, but need not, request written submissions and/or argument from counsel and/or convene a hearing for the purpose of deciding which course to pursue. The district court shall notify the clerk of this court within sixty days of the date hereof as to which option it chooses. In the meantime, we retain appellate jurisdiction. It is so ordered.  _________________ Costs in No. 96-1443 awarded to the School Committee and O'Neill. ________________________________________________________________ -19-