USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

Nos. 98-1994
 98-2086

 ARNOLD H. LICHTENSTEIN,

 Plaintiff, Appellant,

 v.

 CONSOLIDATED SERVICES GROUP, INC. ET AL.,

 Defendants, Appellants.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Gene Carter, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 Bownes, Senior Circuit Judge, 
 and Stahl, Circuit Judge.
 

 Ralph A. Dyer, with whom Law Offices of Ralph A. Dyer,
P.A.,was on brief for appellant, cross-appellee Arnold H.
Lichtenstein.
 Tracy D. Hill, with whom Harold J. Friedman and Friedman,
Babcock & Gaythwaite, were on brief for appellee, cross-appellant
Jonathan G. Fryer.
 Robert E. Mittel, with whom Mittel, Asen, Hunter & Cary were
on brief for appellee Consolidated Services Group, Inc.

April 1, 1999

 
 BOWNES, Senior Circuit Judge. On or about October 1990,
Arnold H. Lichtenstein, vice-president and a minority shareholder,
was ousted from Consolidated Services Group, Inc. ("CSG"), a close
corporation that distributed coffee and bottled water. Two
obstacles stood in the path of an amicable parting of the ways: a
non-compete clause contained in his employment agreement and
disposal of his shares of CSG stock. Lichtenstein attempted to
negotiate a settlement as to the first issue, and decided to sell
his shares in CSG back to the corporation. His former colleagues
took the position that because the incorporation process was never
perfected, CSG did not exist. After efforts to resolve these
matters failed, Lichtenstein filed suit against CSG, John Salterio,
the president and majority shareholder, and others involved with
CSG, alleging, inter alia, breach of contract and breach of
fiduciary duty, and seeking dissolution of the corporation. 
 There are three issues before us. Lichtenstein appeals
from: (1) the entry of summary judgment in favor of Jonathan G.
Fryer, the lawyer who drafted the incorporation documents and
served as voting trustee, on a breach of fiduciary duty claim and
a breach of contract claim; and (2) the denial of attorney's fees. 
Fryer cross-appeals from the district court's denial of his motion
seeking Rule 11 sanctions against Lichtenstein and his counsel for
pursuing allegedly frivolous claims. We affirm.
 I.
 The history of CSG began in late 1988 when Salterio and
Lichtenstein decided to include two others, Peter E. Butera and
Martin D. Keefe, in their plans to form a corporation. Prior to
the decision to incorporate, Salterio and Lichtenstein had been
conducting business as Consolidated Services Group. 
 Fryer was retained for the purpose of preparing the
incorporation papers (which consisted of the Articles of
Incorporation, the Corporate Formation Agreement, the Initial
Employment Agreement, the Resolutions from the First Meeting of
Incorporators, and the Voting Trust Agreement). These documents,
executed on or about April 4, 1989, reflect that the incorporators
issued shares of stock, elected officers and directors, and
established a voting trust empowering Fryer to vote each person's
share of corporate stock as Fryer was directed. The Initial
Employment Agreement set forth the conditions of employment by the
corporation, and included a restrictive covenant barring former
employees of CSG from participating in "any business similar to the
type of business conducted by the corporation" within a 150-mile
radius for a period of three years. 
 Although the parties proceeded to conduct business as
CSG, the business's assets never were transferred to the
corporation, no taxes were ever paid by CSG (instead, Salterio
included the business's income on his personal income tax returns),
and the officers never held a corporate meeting after the
preliminary organizational session. The corporation's authority to
conduct business was suspended in 1991 for failure to pay its
corporate franchise tax to the state of Maine.
 This appeal stems largely from the district court's
treatment of certain motions related to the suit against Fryer. 
The facts underlying plaintiff's case against Fryer, which are
undisputed, can be essentially boiled down as follows: Fryer
prepared CSG's incorporation papers, and he later advised
Lichtenstein that CSG considered Lichtenstein bound by the Initial
Employment Agreement's non-compete clause. Once Lichtenstein
expressed a desire to sell back his stock to the corporation, Fryer
seemingly reversed ground and told Lichtenstein that because the
incorporation of CSG was never perfected there were no shares to
sell or transfer. Based on these circumstances, Lichtenstein
accused Fryer of breach of contract and breach of fiduciary duty in
federal court. For much of the pretrial proceedings, he sought
evidence of collusion between Fryer and Salterio in pilfering
corporate assets and concealing wrongdoing. Despite several months
of discovery, he unearthed no direct evidence of malfeasance by
Fryer.
 Defendants subsequently moved for summary judgment on all
claims. Fryer moved for Rule 11 sanctions against Lichtenstein and
his attorney. The motions were referred to a magistrate judge. 
After thoughtful consideration of the issues, the magistrate judge
recommended that the breach of contract and fiduciary duty claims
against Fryer be dismissed. He reasoned that Fryer's obligation
as voting trustee was contractually limited to voting the shares of
stock in a manner directed by the stockholders, and that there was
no evidence that Fryer breached his fiduciary duty as voting
trustee. Nor, the magistrate concluded, was there any other
fiduciary or contractual relationship between Fryer and
Lichtenstein, for Fryer never represented Lichtenstein in any
capacity after the incorporation papers were drawn up. 
 On September 10, 1996, the district court adopted the
magistrate's recommendation over Lichtenstein's objections, and
entered judgment for Fryer on all claims. The surviving claims
were tried before the district court in March and April of 1997. 
The court issued a memorandum decision and order on August 22,
1997, setting forth its findings of fact and conclusions of law
pursuant to Fed. R. Civ. P. 52. The court ruled, as a preliminary
matter, that CSG was a valid corporation under Maine law. It went
on to hold that Salterio had violated his fiduciary duty to CSG and
its shareholders, but that none of the defendants breached the
Initial Employment Agreement. The court ordered the corporation
dissolved under Me. Rev. Stat. Ann. tit. 13-A, 1115(1)(D), (E)
(West 1998), because of Salterio's fraudulent conduct and misuse of
corporate assets. It then appointed a receiver to complete an
accounting of the business, pay creditors, and distribute the
balance of the resources to the shareholders. See Lichtenstein v.
Consolidated Servs. Group, Inc., 978 F. Supp. 1, 21 (D. Me. 1997).
 As to Fryer's motion for Rule 11 sanctions, the
magistrate judge had recommended that Lichtenstein's counsel be
sanctioned for continuing to pursue claims against Fryer in an
amended complaint after having reason to believe they were without
factual basis. The magistrate found no reason to penalize
Lichtenstein himself. The district court, assessing the matter denovo at the conclusion of the case, held that sanctions were not
warranted. It refused to sanction Lichtenstein or his counsel,
finding that, in light of the "suspicious" nature of the
circumstances, "Fryer['s role] could have been reasonably
understood, in the beginning, as one of complicity with the
activities of Defendants . . . in what appears to the Court to be
an effort to purloin the corporate opportunity from the Plaintiff
and others." 
 The case was eventually settled in the main after the
receiver issued a preliminary report outlining the corporate assets
and recommending certain courses of action. At some point,
Lichtenstein's counsel sought an order awarding attorney's fees,
citing Me. Rev. Stat. Ann. tit. 13-A, 634 (West 1998)
(authorizing court to award "reasonable expenses, including
attorney's fees" in a successful derivative action). The court
concluded, however, that the statute, which had been enacted during
the pendency of the action, did not retroactively apply to cases
such as this. There being no other statutory or contractual basis
for an award of attorney's fees, the motion was denied. 
 This appeal followed.
 II.
 The standards for summary judgment are well-settled, and
need only brief mention. A district court may not grant summary
judgment unless the pleadings and supporting documentation reveal
no genuine issue of material fact. See Fed. R. Civ. P. 56(c). All
reasonable inferences based on the record must be construed in the
non-movant's favor. To avoid the entry of judgment, a party
opposing summary disposition must come forward with reliable
evidence in support of his position. Within these parameters, we
determine de novo whether the district court was correct in
rejecting the claims leveled against Fryer. See Lennon v. Rubin,
166 F.3d 6, 8 (1st Cir. 1999). 
 Lichtenstein asserts that Fryer (sued solely in his
capacity as trustee) was not a voting trustee with a carefully
circumscribed role, but should be treated as a "controlling
shareholder" with broader fiduciary responsibilities to the
corporation generally, and to the minority shareholders
specifically. This assertion does not survive scrutiny. There is
nothing in the record to suggest that Fryer became a shareholder in
CSG; nor was Fryer ever elected as an officer or director of the
company. Hence, the obligations naturally flowing from holding
corporate office, see Me. Rev. Stat. Ann. tit. 13-A, 716 (West
1998), do not apply to Fryer. 
 His only corporate role was to serve as voting trustee. 
Indeed, the CSG documents are replete with references to Fryer as
the "Voting Trustee of the shares of [CSG]." More important, the
Voting Trust Agreement states that "[t]he sole obligation of the
Trustee shall be to cast the vote of each share of stock pursuant
to the written direction of each beneficiary entitled to such
share." In general, the terms of the trust agreement define the
contours of a trustee's duties. See, e.g., Me. Rev. Stat. Ann.
tit. 18-A, 7-302 (West 1998); Restatement (Second) of Trusts 
164, at 341 (1959) (stating general principle that "[t]he nature
and extent of the duties and powers of the trustee are determined
by the terms of the trust"). Against this backdrop, Lichtenstein's
claim that Fryer assumed far-reaching fiduciary obligations has no
merit. The provision of the Voting Trust Agreement at issue not
only expressly limited the power of Fryer as a trustee, but also
specifically narrowed his duty to a single act: that, when called
upon, he would vote the corporate shares of "each beneficiary" as
he was instructed. Fryer had no discretion in fulfilling this
role, and was not invested with any other power or obligation. And
while Fryer occasionally performed legal work for CSG, he acted on
behalf of the corporation, and never represented Lichtenstein
himself.
 Lichtenstein makes a half-hearted attempt to suggest that
the trust established by the Agreement did not satisfy the
conditions of a voting trust under Maine law. If it was not a
valid voting trust, Lichtenstein argues, then presumably some
broader obligations were imposed upon Fryer. This effort leads
nowhere. Other than asserting it to be so, he has come forward
with nothing that creates an issue of fact as to the validity of
the voting trust. The Voting Trust Agreement here plainly
separated the voting rights of the stock from other attributes of
ownership, was implemented for a specific duration, and was created
assertedly for the purpose of avoiding secret voting blocs and
facilitating the transparency of corporate decisionmaking. SeeDelta Kappa Epsilon Theta Chapter v. Theta Chapter House Corp., 661
A.2d 1152, 1153 n.2 (Me. 1995) (reciting general test for voting
trust); Me. Rev. Stat. Ann. tit. 13-A, 619 (West 1998)
(empowering shareholders to create voting trust). This is more
than enough to establish the presumptive validity of the voting
trust. Lichtenstein fails to refute this evidence or otherwise
demonstrate that, despite the unmistakable language of the Voting
Trust Agreement transferring to Fryer only the authority to vote
stocks, the incorporators actually effected a broader delegation of
ownership rights or other powers to Fryer. 
 Unable to establish a violation of Fryer's duty as voting
trustee or an independent legal relationship with Fryer,
Lichtenstein's claims necessarily fail. We will not revive them.
 III.
 We next consider Fryer's motion for Rule 11 sanctions,
reviewing the trial court's denial of the motion for abuse of
discretion. See Salois v. Dime Sav. Bank of New York, 128 F.3d 20,
28 (1st Cir. 1997). Rule 11 permits a court to impose sanctions on
a party or lawyer for advocating a frivolous position, pursuing an
unfounded claim, or filing a lawsuit for some improper purpose. 
See Fed. R. Civ. P. 11(b). While a trial court's decision to
impose sanctions is given considerable latitude on appeal, a
court's determination is accorded "extraordinary deference" when it
has decided to deny sanctions. Salois, 128 F.3d at 28. This zone
of discretion is predicated on the understanding that trial courts
are in the best position to evaluate the intricacies of a case and
to reach conclusions about the motives of the parties and their
counsel.
 Although Fryer originally argued that Lichtenstein
brought the action in bad faith (a contention rejected by the
magistrate), he does not press that argument here. Instead, he 
contends that the claims were objectively frivolous, and that they
certainly were shown to be "without evidentiary support" by the
time of Lichtenstein's deposition. He faults two aspects of the
district court's decision in refusing to invoke its Rule 11 power:
that the court improperly evaluated the heft of the claims in light
of the full trial record rather than as it existed at the time of
the filing of the First Amended Complaint; and that the court
failed sufficiently to articulate its reasons for denying the
motion. 
 Whether a litigant breaches his or her duty to conduct a
reasonable inquiry into the facts and the law "depends on the
objective reasonableness of the litigant's conduct under the
totality of the circumstances." Navarro-Ayala v. Nunez, 968 F.2d
1421, 1425 (1st Cir. 1992). The factors to be assessed may include
"the complexity of the subject matter, the party's familiarity with
it, the time available for the inquiry, and the ease (or
difficulty) of access to the requisite information." Id.
 Fryer argues that the court's frame of reference in
considering this question was skewed, directing our attention to
language in the court's decision indicating that it evaluated the
motion in light of "all the circumstances now known" at the end of
trial. Of course, claims challenged as frivolous must be viewed
from the appropriate vantage point. For instance, a party who
brings a suit without conducting a reasonable inquiry and based on
nothing more than a prayer that helpful facts will somehow emerge,
and who through sheer fortuity is rewarded for his carelessness, is
nevertheless vulnerable to sanctions. See Garr v. U.S. Healthcare,
Inc., 22 F.3d 1274, 1279 (3d Cir. 1994) ("A shot in the dark is a
sanctionable event, even if it somehow hits the mark."). In such
a case, it would be improper for the court to view the strength of
the case in hindsight. But that is not what happened here. 
 In his Memorandum Decision and Order, Judge Carter did
signal that he believed he was in a superior position to assess the
strength of the case after conducting the bench trial. But he also
stressed that "there was a reasonable basis for [plaintiff's
counsel] . . . to have been, in the beginning, suspicious of the
claimed disinterestedness of Fryer in his role on behalf of
Salterio." It is perfectly reasonable to say, as the district
court did here, that the claims were not frivolous "at the
beginning," especially given the murky facts of the case, which
were so confused and "suspicious" that significant efforts were
required of the court to later sort them out. Such an honest
observation does not mean that the court employed the wrong frame
of reference. 
 It was also entirely appropriate for the court to
consider the Rule 11 motion at the conclusion of the bench trial. 
Courts should, and often do, defer consideration of certain kinds
of sanctions motions until the end of trial to gain a full sense of
the case and to avoid unnecessary delay of disposition of the case
on the merits. This is a sensible practice where the thrust of the
sanctions motion is that institution of the case itself was
improper. See 5A Charles Alan Wright & Arthur R. Miller, Federal
Practice and Procedure 1337, at 121 (2d ed. 1990). 
 In all events, even when viewed at the time of the filing
of the First Amended Complaint, the claims were not so patently
frivolous that sanctions necessarily should have been imposed. 
Fryer's intermittent and arguably suspicious involvement by first
asserting that the Initial Employment Agreement was enforceable and
then advising that there was no corporation, coupled with the fact
that the legal status of the corporation itself was in doubt
throughout much of the litigation, counseled in favor of the
court's decision that the lawsuit against Fryer had sufficient
basis. Although Fryer insists that Lichtenstein's own deposition
showed that the claims against Fryer were absolutely unfounded, we
take a different view. Evidence of misconduct by Fryer, if it
existed, would not necessarily have been known by Lichtenstein. 
Moreover, in this case Lichtenstein's testimony did nothing to
detract from the existence or non-existence of such evidence;
during his deposition, he admitted neither to closing a blind eye
to facts that would tend to exculpate Fryer nor to filing suit
against Fryer for some improper reason. Hence, Lichtenstein's
testimony did not demonstrate that the case against Fryer was
obviously groundless or that he or his lawyer failed to conduct a
reasonable inquiry into the facts before filing suit. In view of
these circumstances, the trial court was well within its broad
authority to refuse to impose sanctions. 
 Fryer's fallback argument namely, that the court's
explanations in turning down the fee request were so thin as to
preclude meaningful appellate review likewise misses the target. 
The district court made perfectly clear what its reasons were for
denying the motion. We have never required more than that the
court's rationale be apparent from the face of the record and
supported by the facts. See Anderson v. Boston Sch. Comm., 105
F.3d 762, 769 (1st Cir. 1997). Those conditions were met here.
 IV.
 One last issue remains: the matter of attorney's fees. 
The district court initially rebuffed the request of plaintiff's
counsel because Maine law, which embraces "the American Rule,"
requires litigants to pay their own fees in the absence of an
enforceable agreement or some statutory authorization of fee
recovery. See Goodwin v. School Admin. Dist. No. 35, 721 A.2d 642,
646 n.8 (Me. 1998). The court held that title 13-A, 634, which
expressly authorizes fees for stockholder derivative actions, was
enacted during the course of the litigation and did not
retroactively apply to this suit. Lichtenstein's counsel does not
challenge that determination on appeal.
 Instead, he resorts to a creative alternative: that he is
entitled to fees carved out of a "common fund" achieved through
settlement. This was a ground first mentioned in Lichtenstein's
reply papers below, but not explicitly addressed by the district
court. We consider it now.
 Where a common fund is created to resolve multiple claims
in derivative or class actions, certain jurisdictions have allowed
fee awards to be drawn from the fund itself "to spread the burden
among the entire class of persons benefitted." Catullo v. Metzner,
834 F.2d 1075, 1083 (1st Cir. 1987); see also In re Thirteen
Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,
56 F.3d 295, 305 n.6 (1st Cir. 1995). Although Maine recently
joined those states that have recognized this equitable basis for
attorney's fees, see York Ins. Group of Maine v. Van Hall, 704 A.2d
366, 368 (Me. 1997) (expressly adopting common fund doctrine),
Lichtenstein's claim is undone by the fact that no common fund was
ever created in this case. Each aggrieved individual reached a
separate settlement, and presumably paid his lawyer's fees from his
respective share of the settlement. Moreover, while Lichtenstein
certainly deserves some credit for exposing the irregularities
surrounding CSG, none of the usual policy considerations motivating
invocation of the common fund exception e.g., preventing unjust
enrichment where a large class of beneficiaries have benefitted
from the labor of another's counsel are at work here. There were
few shareholders involved, each gained a measure of satisfaction,
and each was represented by separate counsel. We discern no free-
rider problem. See Catullo, 834 F.2d at 1083 ("[T]he award of fees
under the common fund doctrine presupposes a large class of
beneficiaries who do not participate in the litigation."). Under
the circumstances, we do not believe that Lichtenstein's attorney
is entitled to fees on this equitable basis. 
 Affirmed. Each party shall bear its own costs.