CONNECTICUT JUNIOR REPUBLIC & others[1] *vs.* PAUL S.
DOHERTY & others.[2]

Hampden. January 16, 1985. — May 28, 1985.

Present: PERRETTA, KASS, & WARNER, JJ.

*Attorney at Law,* Negligence. *Negligence,* Attorney. *Will,* Mistake,
Ratification.

In an action by certain charities named as beneficiaries in the first codicil
to a will against the attorney who had drafted a second codicil, in
response to amendments to the Internal Revenue Code, and in doing so
had inadvertently substituted the charities originally named in the will
for those named in the first codicil, evidence of the circumstances in
which the testator had executed the second codicil supported the judge's
conclusion that the testator had ratified a return to the original charities.
[110-111]

CIVIL ACTION commenced in the Superior Court Department
on October 1, 1981.

The case was heard by *Eileen P. Griffin,* J.

*David P. Grossi (Paige Dunmire* with him) for the plaintiffs.

*Erik Lund (Edward L. Donnellan & John Egan* with him)
for the defendants.

KASS, J. Eight charities complain that a lawyer's error in
drafting a codicil cost them $1,305,060 in bequests. A judge
of the Superior Court, who heard the case without a jury,
determined that, to the extent the lawyer erred, the testator

---

[1] American Friends Service Committee, Inc., of Cambridge, Massachu-
setts; Robert C. Geer Memorial Hospital, of Canaan, Connecticut;
Housatonic Mental Health Center, Inc., of Lakeville, Connecticut; The
Scoville Memorial Library, of Salisbury, Connecticut; The Connecticut
Institute for the Blind, of Hartford Connecticut; The Springfield Museum
of Fine Arts, of Springfield, Massachusetts; The George Walter Vincent
Smith Museum, of Springfield, Massachusetts.

[2] Mr. Doherty's partners in the law firm of Doherty, Wallace, Pillsbury
& Murphy.

consciously ratified the mistake, thus relieving the draftsman of liability. We affirm.

Here are the background facts. Richards Haskell Emerson executed a will on May 19, 1960, which provided for residuary legacies to seven charities (original charities).[3] At that time Emerson was domiciled in Lakeville, Connecticut, to which he had retired after many years of residence in Springfield, Massachusetts. Nine years later, Emerson decided to alter the list of charitable beneficiaries. To effect that purpose, as well as some other changes in his will, he employed Mr. Paul S. Doherty, who practices law in Springfield, to draw a codicil. Mr. Doherty did so and Emerson executed the codicil on December 4, 1969. The codicil designated eleven charities (first codicil charities), of which only one, The Sharon Hospital, Inc., of Sharon, Connecticut, was included among the original charities.

Subsequent amendments[4] to the Internal Revenue Code put in question whether some of the charitable bequests in Emerson's estate plan, which were charitable remainders of trusts, would be allowed as deductions. It had become necessary to create charitable remainder annuity trusts. The point was called to Emerson's attention in 1975 by Sager McDonald, a senior vice president of the trust department of The Third National Bank of Hampden County, the banking institution which Emerson had nominated as executor and trustee under his will. At Emerson's request, McDonald asked Mr. Doherty to make the necessary repairs by means of a second codicil.

There then occurred the fateful switch of beneficiaries which prompted this action. In drafting the second codicil, Mr. Doherty, apparently working from the original will rather than the

---

[3] The original charities were The Sharon Hospital, Inc., of Sharon, Connecticut; Nantucket Cottage Hospital, of Nantucket, Massachusetts; American Society for the Prevention of Cruelty to Animals, of New York, New York; Springfield Home for Aged Men, Springfield Home for Aged Women, Springfield Hospital and Wesson Maternity Hospital, all of Springfield, Massachusetts.

[4] Those amendments were enacted as part of the Tax Reform Act of 1969, P.L. 91-172, 83 Stat. 487, on December 30, 1969, i.e., very soon after Emerson signed the first codicil.

first codicil, inadvertently substituted the original charities for the first codicil charities. He concedes he received no instruction from McDonald or from Emerson so to do. Mr. Doherty sent his draft of the second codicil to McDonald, who suggested correction of the names of two of the hospital beneficiaries, but, so far as appears did not compare the draft with the first codicil. After making the further changes which McDonald had proposed, Mr. Doherty sent the final version of the codicil to McDonald, who, in turn, forwarded it to Emerson. On October 24, 1975, McDonald and three other persons went to Emerson's home to preside over the execution of the second codicil. That ceremony was not a slap-dash affair.

Emerson, whom the judge found to have been "an avid reader and an intelligent and meticulous man who paid careful attention to his personal and financial affairs," met privately with McDonald before executing the second codicil. Over a period of some forty-five minutes, McDonald read aloud the second codicil, while Emerson followed a copy, and answered Emerson's questions, which focused on the effects of the new trust arrangements on the life interests he had created. Emerson made no comment about the names of the charitable remaindermen during his discussion with McDonald or immediately thereafter when he executed the codicil. Some time within the following year, however, he observed to Harvey Moses, a long-time friend and financial adviser, that he had "reverted or returned or gone back to his original list of charities."[5] After Emerson and McDonald conferred, execution of the second codicil took place in the presence of McDonald and the three persons whom McDonald had brought with him. McDonald and two others signed the document as witnesses to the declaration by the testator that the document represented

---

[5] Moses' account of the conversation was admitted in evidence by reading a deposition of Moses, taken in February, 1980. Moses died before the trial, which occurred in November, 1983. A letter, dated December 13, 1979, from Moses to an officer of The Third National Bank of Hampden County also reported that Emerson had told Moses that he had signed a new codicil and "gone back" to the "older distribution."

the second codicil to the will. The third person McDonald brought to the ceremony was a Connecticut notary who took the oaths of the three witnesses on a self-proving affidavit which was part of the second codicil.

Emerson died in Connecticut on October 3, 1979, at age 79. His will and the two codicils were admitted to probate in Connecticut.

These facts we have taken from the findings of the trial judge, which we accept unless clearly erroneous. Mass. R.Civ.P. 52(a), 365 Mass. 816 (1974). From her findings the judge drew the conclusion that when Emerson executed the second codicil he did so with full knowledge of all the essential facts and, therefore, ratified substitution of the original charities for the first codicil charities. See *Kidder* v. *Greenman,* 283 Mass. 601, 615 (1933); *Botticello* v. *Stefanovicz,* 177 Conn. 22, 28 (1979); Restatement (Second) of Agency § 82 (1958).[6]

There is a presumption that a person who signs a writing that is obviously a legal document knows its contents. *Richardson* v. *Richards,* 226 Mass. 240, 245 (1917). *Dobija* v. *Hopey,* 353 Mass. 600, 603 (1968). *Ursini* v. *Goldman,* 118 Conn. 554, 562 (1934). *Corona* v. *Esposito,* 4 Conn. Cir. Ct. 296, 301-302 (App. Div. 1966). See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 440 (1980). In the case of a will, that presumption is particularly powerful because more than ordinary care usually attends the preparation and execution of that kind of document. *Rockwell's Appeal,* 54 Conn. 119, 120-121 (1886). When, as in the instant case, the will is read to an alert testator and discussed, the proposition that the testator is acting advisedly gains still more force. 1 Page, Wills § 5.9, at 179-181 (Bowe-Parker rev. 1960).

Of course it is somewhat unsatisfactory that a major shift in the donative scheme originated as a mistake rather than by

---

[6] The parties agree that Connecticut law governs the substantive questions which the case presents. What constitutes ratification? Does Emerson's ratification supersede any liability which might flow from Mr. Doherty's drafting error? The applicable principles are the same under the law of Connecticut and Massachusetts.

instruction of the testator. One could imagine a certain suspension of critical attention by the testator and his adviser to that portion of the instrument which they could expect to be repetitive. Still, the more common experience is that the dispositive provisions of a testamentary document, i.e., the ones which say who gets what, are those which attract closer scrutiny of a testator than technical provisions. Often an estate plan may contain provisions which are idiosyncratic, disappointing, and even unthinkable to those with defeated expectations. Perhaps it is to ward off attacks from such persons that the general rule has developed that a competent testator meant what he signed and signed what he meant.

The second codicil consisted of only seven pages before the signature blocks. The remainder charities were recited twice. They were, therefore, read aloud to the testator by McDonald twice. They seem to have struck no dissonant note. Those circumstances, together with the deposition of Moses that Emerson remarked that he had reverted to the original charities, constituted sufficient basis for the judge's mixed fact and law conclusion that Emerson had ratified a return to the original charities.[7]

Given a supportable finding of ratification, the plaintiffs' tort action against Mr. Doherty falls on the issue of proximate cause. Mr. Doherty's mistake may have set the change of beneficiaries in motion, but Emerson's ratification of the change was a superseding cause of any cognizable loss by the plaintiffs. Emerson was an intelligent testator in possession of all material information, who took full responsibility for control of the designation of beneficiaries in the second codicil to his will. Mr. Doherty had performed only a technical drafting task. Prevention of harm to the plaintiffs was fully within

---

[7] In her findings, the judge observed that "[t]here is absolutely no evidence that [Emerson] failed to understand what he read, heard and signed [on October 29, 1975]." The appellants mistakenly interpret this remark as reflecting a view on the part of the judge that they bore the burden of disproving ratification, the defendants' affirmative defense. We think the judge's statement means that, after the defendants demonstrated ratification, by virtue of the presumption and the evidence of Emerson's care and actual knowledge, the plaintiffs failed to introduce any relevant evidence in rebuttal.

Emerson's control when he received and carefully read the second codicil. See Restatement (Second) of Torts 452(2) and comments a, d, and f (1965).

We leave for another day and other facts the question whether "removed beneficiaries," as plaintiffs term themselves, can come within the scope of protection sometimes accorded to intended beneficiaries when a testator's clearly expressed intent to benefit them is frustrated because of an attorney's professional negligence. See *Stowe* v. *Smith*, 184 Conn. 194 (1981).[8] Compare *Lucas* v. *Hamm*, 56 Cal. 2d 583 (1961), and *McAbee* v. *Edwards*, 340 So.2d 1167 (Fla. Dist. Ct. App. 1976) (both recognizing a named beneficiary's cause of action against an attorney when technical errors undid an intent otherwise apparent from the will)[9] with *Ventura County Humane Society* v. *Holloway*, 40 Cal. App. 3d 897 (1974), and *DeMaris* v. *Asti*, 426 So.2d 1153 (Fla. Dist. Ct. App. 1983) (rejecting actions where plaintiffs were named ambiguously or not at all). See generally, Note, Attorney Negligence in Real Estate Title Examination and Will Drafting: Elimination of the Privity Requirement as a Bar to Recovery by Foreseeable Third Parties, 17 New Eng. Law Rev. 955 (1982); Mallen & Levit, Legal Malpractice § 80 (2d ed. 1981 and 1985 Supp.), and cases cited. In the present case, the findings supported by the record established that, at the time of executing the second codicil, the testator did not intend to benefit the plaintiffs. See *Hiemstra* v. *Huston*, 12 Cal. App. 3d 1043 (1970). We are not presented with a situation in which a third party demonstrates foreseeable and justifiable reliance upon the attorney's performance. Compare *Page* v. *Frazier*, 388 Mass. 55, 64-66 & n.11 (1983).

---

[8] In *Stowe* v. *Smith*, the complaint alleged that the testatrix had instructed the defendant to prepare a will which would provide for the distribution of the corpus of a testamentary trust to the plaintiff when he attained age fifty, but should the plaintiff die before age fifty, to the plaintiff's issue. Instead, the will as drawn provided that when the plaintiff reached age fifty, or should sooner die, the trust assets would be distributed to his issue.

[9] In the *Lucas* case a trust failed because of the draftsmen's failure to take into account the rule against perpetuities. In the *McAbee* case, the lawyer failed to consider the Florida pretermitted spouse statute.

On the view we have taken of the case, it is not necessary to consider the other issues raised on the appeal and cross appeal.

*Judgment affirmed.*