Robert SALOIS and Dianne E. Salois, Ninon R.L. Freeman, and David M. Leary and Linda Scurini–Leary, Individually and on behalf of Others Similarly Situated, Plaintiffs, Appellants,

v.

The DIME SAVINGS BANK OF NEW YORK, FSB, Harry W. Albright, Jr., John B. Pettit, Jr., William J. Mellin, William J. Candee Iii, William A. Volckhausen, James E. Kelly, Ralph Spitzer, Robert G. Turner, Brian Geraghty, Lawrence W. Peters, E. Judd Staley III, and John Doe Companies, Defendants, Appellees.

Robert SALOIS, et al. Plaintiffs, Appellees,

v.

The DIME SAVINGS BANK OF NEW YORK, et al. Defendants, Appellants.

Nos. 97–1049, 97–1050.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 1997.

Decided Nov. 3, 1997.

Evans J. Carter, Framingham, MA, with whom Hargraves, Karb, Wilcox & Galvani was on brief, for appellants.

William S. Eggeling, Providence, RI, with whom Roscoe Trimmier, Jr., Darlene C. Lynch, Jane E. Willis, and Ropes & Gray, Boston, MA, were on brief, for appellees.

Before SELYA, BOUDIN, and STAHL, Circuit Judges.

STAHL, Circuit Judge.

In the mid–1980s defendant The Dime Savings Bank of New York, FSB ("Dime") made mortgage loans to plaintiffs Dianne and Robert Salois, David M. Leary and Linda Scurini–Leary, and Ninon R.L. Freeman. Plaintiffs now appeal from the district court's dismissal on statutes of limitations grounds of various federal and Massachusetts statutory claims as well as common-law contract and fraud claims arising from the mortgage transactions.[1] Defendant cross-appeals from the court's denial of its motion for Fed. R.Civ.P. 11 sanctions against plaintiffs' attorneys. We affirm the district court's ruling that statutes of limitations barred all of plaintiffs' claims and uphold the district court's denial of Dime's motion for Rule 11 sanctions because that denial was not an abuse of the court's discretion.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

Because plaintiffs challenge the district court's dismissal of their claims under Fed. R.Civ.P. 12(b)(6), we recite the facts and reasonable inferences raised by the facts in their favor. *See Aybar v. Crispin–Reyes*, 118 F.3d 10, 13 (1st Cir.1997).

---

**1.** The amended complaint alleges (1) violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, (2) violation of the federal Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.* and Regulation Z, 12 C.F.R. pt. 226, (3) violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601–2617 and Regulation X, 24 C.F.R. pt. 3500, (4) violation of the federal Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§ 3801–3806, (5) violation of the Massa-

chusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, (6) violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, (7) breach of contract, (8) breach of the implied covenant of good faith and fair dealing, (9) breach of fiduciary duty, (10) fraud, deceit, and misrepresentation, (11) civil conspiracy, and (12) negligent misrepresentation, negligent hiring and supervision, and vicarious liability.

Dime is a federally-chartered savings bank. Between July 1, 1986, and December 31, 1989, Dime, through its wholly owned subsidiary, Dime Real Estate Services—Massachusetts, Inc. ("DRES–MA"), made over four thousand (4,000) home mortgage loans on residential homes located in Massachusetts, totalling over six hundred million dollars ($600,000,000). DRES–MA ceased to exist in 1990.[2]

Dime marketed to Massachusetts residential home purchasers an adjustable rate loan product known as the Impact Loan. In evaluating applications for Impact Loans, Dime required only minimal verification of the employment status, assets, and income of prospective borrowers, basing its lending decisions instead on the value of the property subject to the mortgage. Moreover, Dime loan officers operated under instructions to push Impact Loans to the virtual exclusion of other types of mortgage loans. This effort was part of Dime's national campaign to expand rapidly its home lending business.

A principal feature of an Impact Loan was an initial "teaser" interest rate of 7.5 percent for the first six months with a cap of 9.5 percent for the second six months. Thereafter, the rate would adjust to conform to the Cost of Funds Index plus three percent, with a cap of 13.9 percent. This arrangement was designed to result in negative amortization, a situation in which monthly loan payments fall short of the actual monthly interest due on the loan. The unpaid interest, or "deferred interest," is then added to the principal and begins to accrue interest itself, causing the principal owed to increase despite the borrower's regular payments. The terms of the Impact Loan provided that no payments or portions of payments would apply to the principal until all "deferred interest," or negative amortization, had been paid. Once the principal balance reached 110 percent of the original principal amount, the loan contracts required mortgagors to make fully amortizing payments; that is, mortgagors were required to increase their monthly payments to cover the additional principal plus interest.

Plaintiffs secured residential Impact Loans from DRES–MA in 1986 and 1987. To induce plaintiffs to enter the loan contracts, Dime downplayed the negative amortization feature of the Impact Loans, and discouraged plaintiffs from hiring their own attorneys by telling them that Dime attorneys would "handle things" and "protect" them. Six months into the loans, monthly statements revealed increases in the owed principal, and, in the second year, deferred interest began to appear on the statements. Although the initial loan documents contained the information from which plaintiffs could have discovered that their loan payments would increase, plaintiffs contend that teasing this information out of the documents would have required computation skills, computer software, and a level of sophistication that they did not, and could not have been expected to, possess. In addition, plaintiffs argue that Dime charged them excessive fees for closing the loan contracts, serviced their loans improperly by providing unsatisfactory responses to their queries about negative amortization, and altered the Saloises' loan impermissibly by requesting that the Saloises sign "corrective" documents that lifted a two percent per month cap on the interest rate applicable to the loan.

At the time of the complaint, plaintiffs Robert and Diane Salois continued to hold their mortgage. Plaintiffs David M. Leary and Linda Scurini–Leary had defaulted, and the mortgage on their home was foreclosed on in 1991. Plaintiff Ninon R.L. Freeman paid her loan in full in 1993. The Saloises were alerted to their potential claims when they consulted an attorney about their financial situation in late September, 1994, and Ms. Freeman and the Learys were similarly advised in mid–1995. The Saloises filed this action on September 1, 1995, in the United States District Court for the District of Massachusetts, as a putative class action on behalf of all persons who secured residential mortgage loans from Dime in Massachusetts between July 1, 1986, and December 31, 1989. Dime responded on October 5, 1995,

2. It is unclear from the record whether DRES–MA was merged into Dime or whether it was *dissolved.*

with a motion to dismiss the complaint as untimely. On November 10, 1995, Dime further moved for Rule 11 sanctions, alleging that there was no legal or factual basis for plaintiffs' claims. The Saloises filed an amended complaint on February 9, 1996, which added the Learys and Ms. Freeman as plaintiffs. In a margin order dated November 6, 1996, the district court denied the Rule 11 motion and, on November 13, 1996, dismissed the complaint on statutes of limitations grounds. Because the court never acted on plaintiffs' motion for class certification, no class was certified. This appeal and cross-appeal followed.

## II.

### DISCUSSION

#### A. Plaintiffs' Claims

On appeal, plaintiffs contend that the district court erred in dismissing their actions on statutes of limitations grounds, arguing that the claims are subject to equitable tolling and thus are timely. They further contend that their claims warrant relief on the merits. We begin with the statutes of limitations issue because, if plaintiffs claims in fact are time-barred, that finishes the case.

Arguing for equitable tolling, plaintiffs draw on federal and Massachusetts law providing that fraud, fraudulent concealment, and wrongs resulting in inherently unknowable injuries toll limitations periods, and on Massachusetts law providing that limitations periods may be tolled by the existence of and breach of a fiduciary duty. The heart of plaintiffs' allegations is that Dime fraudulently concealed the fact that their loans would *definitely*, rather than only possibly, go into negative amortization and accrue deferred interest. Plaintiffs assert that this information became available only after they consulted a knowledgeable attorney who was able to decipher the meaning of the facts and figures contained in their loan documents. Further, plaintiffs contend that issues of fact relating to the propriety of tolling should have precluded the district court from dismissing their claims based on the pleadings alone. We are not persuaded.

As an initial matter we note that plaintiffs' TILA, RESPA, and Parity Act claims are subject to one-year statutes of limitations.[3] Thus, these claims must have accrued no earlier than September 1, 1994. The claims for breach of fiduciary duty; fraud, deceit, and misrepresentation; civil conspiracy; and negligent misrepresentation, negligent hiring and supervision, and vicarious liability are governed by a three-year limitations period.[4] These claims must therefore have accrued no earlier than September 1, 1992. Plaintiffs' claims under RICO and the Massachusetts Consumer Credit Cost Disclosure and Consumer Protection Acts are subject to four-year limitations periods.[5] Thus, these claims must have accrued no earlier than Septem-

---

3. The TILA states that "[a]ny action under this section may be brought ... within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The RESPA provides that "[a]ny action pursuant to the provisions of section ... 2607 ... of [Title 12] may be brought ... within 1 year ... from the date of the occurrence of the violation." 12 U.S.C. § 2614. The Parity Act states that "[a]ny violation of this section shall be treated as a violation of the Truth in Lending Act." 12 U.S.C. § 3806(c). We note that one other court of appeals has held that the RESPA is not subject to tolling doctrines. *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1041 (D.C.Cir.1986). We need not address the correctness of this ruling because, for reasons we shall explain, equitable tolling is not warranted on the facts of this case.

4. Massachusetts law provides that "actions of tort ... shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A.

5. Massachusetts law provides that "[a]ctions arising on account of violations of any law intended for the protection of consumers, including but not limited to ... chapter ninety-three A ... [and] chapter one hundred and forty D ... whether for damages, penalties or other relief and brought by any person ... shall be commenced only within four years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 5A.

With regard to RICO claims, the Supreme Court has held that "the federal policies that lie behind RICO and the practicalities of RICO litigation make the selection of the 4–year statute of limitations for Clayton Act actions, 15 U.S.C. § 15b, the most appropriate limitations period for RICO actions." *Agency Holding Corp. v. Malley–Duff & Assoc. Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987).

ber 1, 1991. Finally, plaintiffs' claim for breach of contract is governed by a six-year limitations period.[6] Thus, the contract cause of action must have accrued no earlier than September 1, 1989.

■ A cause of action generally accrues at the time of the plaintiff's injury, or, in the case of a breach of contract, at the time of the breach. *See Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993) (discussing Massachusetts law). Therefore, plaintiffs' claims arose when Dime allegedly induced them to sign loan contracts by misrepresenting and/or omitting facts about the terms of the mortgage, charged them excessive closing fees, and serviced their loans improperly by giving inadequate answers to telephone inquiries about negative amortization and by having the Saloises sign corrective documents that improperly altered their loan.

The district court examined each of plaintiffs' claims and concluded that virtually all federal causes of action accrued when plaintiffs entered their respective loan contracts [7] and, in any event, no later than mid–1988, when the Saloises signed the corrective documents. The district court also concluded that, with the exception of plaintiffs' claims based on Mass. Gen. Laws ch. 167E, *see infra*, the state claims accrued no later than either the point at which the corrective documents were signed or the point at which plaintiffs called Dime and were provided inaccurate answers about deferred interest. Although there may be a dispute as to when, exactly, some of the causes of action accrued,[8] plaintiffs do not dispute that their claims accrued outside the relevant limita-

tions periods. Accordingly, the viability of plaintiffs' claims depends on whether principles of equitable tolling apply.

### 1. Federal Claims

■ Although, under federal law, equitable tolling is applied to statutes of limitations "to prevent unjust results or to maintain the integrity of a statute," *King v. California*, 784 F.2d 910, 915 (9th Cir.1986), courts have taken a narrow view of equitable exceptions to limitations periods, *see Earnhardt v. Puerto Rico*, 691 F.2d 69, 71 (1st Cir.1982). Indeed, equitable tolling of a federal statute of limitations is "appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1266 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991).

■ The federal doctrine of fraudulent concealment operates to toll the statute of limitations "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'" *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874)); *see Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 127 (1st Cir.1987). For plaintiffs to be successful in their argument, we must determine that "(1) sufficient facts were [not] available to put a reasonable [borrower] in plaintiff[s'] position on inquiry notice of the *possibility* of fraud, and (2) plaintiff[s] exercised due diligence in attempting to uncover

---

6. Massachusetts law provides that "[a]ctions of contract ... shall ... be commenced only within six years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2.

7. The Freemans and the Learys entered into their loan contracts with Dime no later than November 18, 1986, and April 15, 1987, respectively; the Saloises executed a note and mortgage on June 16, 1987, and executed corrective notes on February 29, 1988, and June 1, 1988. Plaintiffs telephoned Dime sometime in the second year of their loans when deferred interest began to appear on their monthly statements. This must have occurred no later than mid–1989. *See infra* note 8.

8. Although the district court concluded that the events giving rise to plaintiffs' claims all must have taken place no later than mid–1988, we conclude that the phone calls may have taken place as late as mid–1989. Construing facts in the light most favorable to plaintiffs, we assume that it was the *Saloises* who placed the calls, and that it was the *end* of the "second year of their loan" when they did so, which means the calls may not have been made until June 16, 1989. Even using this later date as the benchmark, however, plaintiffs' causes of action accrued at least six years and almost three months prior to the date plaintiffs filed their original complaint.

the factual basis underlying this alleged fraudulent conduct." *Maggio,* 824 F.2d at 128. Thus, allegations of fraudulent concealment do not modify the requirement that plaintiffs must have exercised reasonable diligence. *See Truck Drivers & Helpers Union v. NLRB,* 993 F.2d 990, 998 (1st Cir.1993) ("Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim."). In simpler terms, fraud may render reasonable a plaintiff's otherwise unreasonable conduct, but there are limits: plaintiffs must still exercise reasonable diligence in discovering that they have been the victims of fraud.

■ In this case, the inquiry is over before it begins. Regardless whether negative amortization was inevitable with Impact Loans, the documents contained all of the information necessary to determine the interaction of Dime's formula with prevailing interest rates. It was attorney consultation, rather than newly-discovered information, that prompted plaintiffs' lawsuit. Therefore, sufficient facts—indeed, *all* the facts—were available to place plaintiffs on inquiry notice of fraudulent conduct. Moreover, even if we regard plaintiffs' consultation with an attorney as "discovered" information that revealed Dime's alleged concealment, it cannot be said that plaintiffs were reasonable in

waiting until 1994 to consult an attorney, when it was clear as early as 1988 that their loans had begun to accrue deferred interest.[9] As the district court observed, "The loan documents notified plaintiffs of the possibility of negative amortization, when it would apply, and how it would work," so that even "[i]f [Dime] had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud." *Salois v. Dime Savings Bank,* No. 95–11967–PBS, slip op. at 14 (D.Mass. Nov. 13, 1996).[10]

■ Plaintiffs argue that whether they were reasonably diligent in ascertaining their claims is a matter of fact to be determined by a jury. Even if we accept all facts as plaintiffs present them, however, nothing in the record supports the conclusion that plaintiffs exercised reasonable diligence as a matter of law. *Cf. Sleeper v. Kidder, Peabody & Co.,* 480 F.Supp. 1264, 1265 (D.Mass.1979) (noting that although the issue of reasonable diligence is factually based, it may be determined as a matter of law where the underlying facts are admitted or established without dispute), *aff'd mem.,* 627 F.2d 1088 (1st Cir. 1980). Thus, the district court's dismissal of plaintiffs' claims was proper.[11]

### 2. State Claims

■ The foregoing analysis likewise disposes of plaintiffs' argument for tolling on

---

9. Once deferred interest began to accrue, after the first year of the repayments, the bases of all of the plaintiffs' present claims had come to their attention. That they did not seek legal advice in 1988 (or, in any event, before the running of the relevant statutes of limitations) seems to be more a matter of happenstance than lack of relevant information. We think the district court stated the issue well: "No facts are alleged as to what prompted plaintiffs to consult an attorney, if not their loan documents and monthly statements.... If the plaintiffs' loan documents and statements prompted them to consult an attorney in 1994 and 1995, unprompted by any new disclosure, there is no reason they could not have consulted an attorney several years earlier." *Salois v. Dime Savings Bank,* No. 95–11967–PBS, slip op. at 15 (D.Mass. Nov. 13, 1996).

10. In addition, we note that, under Massachusetts law, "one who signs a writing that is designed to serve as a legal document ... is presumed to know its contents." *Hull v. Attleboro Savings Bank,* 33 Mass.App.Ct. 18, 24, 596

N.E.2d 358 (1992); *see Lerra v. Monsanto Co.,* 521 F.Supp. 1257, 1262 (D.Mass.1981); *Connecticut Jr. Republic v. Doherty,* 20 Mass.App.Ct. 107, 110, 478 N.E.2d 735 (1985). Thus, as a matter of Massachusetts law, plaintiffs were on notice of their claims when they signed their loan documents in 1986 and 1987.

11. Plaintiffs also contend that there are issues of fact regarding whether Dime was a fiduciary to plaintiffs and whether Dime fraudulently concealed information, and that the existence of such factual issues precludes dismissal. To this we note that, first, simply alleging fraudulent concealment or the existence of a fiduciary duty does not suffice to avoid dismissal. *See General Builders Supply Co. v. River Hill Coal Venture,* 796 F.2d 8, 12 (1st Cir.1986). Second, plaintiffs' claims may be dismissed without determining these issues because, even if plaintiffs' allegations regarding fraud and fiduciary duties are true, plaintiffs still fail the ultimate test, that of reasonableness in discovering and pursuing their claims.

the basis of *state* fraudulent concealment doctrine. Massachusetts law provides that, "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." Mass. Gen. Laws ch. 260, § 12. Specifically, a statute of limitations may be tolled "if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means of acquiring knowledge of such facts." *Maggio,* 824 F.2d at 131 (emphasis omitted) (quoting *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678 (1980)). Here, an analysis of whether Dime concealed the means of acquiring the facts giving rise to their claims would parallel a reasonable diligence inquiry, which, as we have already concluded, plaintiffs fail. Yet we need not rely on that analysis because, again, Dime did not conceal from plaintiffs the facts themselves and therefore cannot be said to have kept plaintiffs from acquiring the requisite knowledge.

■ But plaintiffs persist, focusing on the possibility of a fiduciary relationship between themselves and Dime and arguing that Massachusetts limitations periods should be tolled because Dime's breach of an alleged fiduciary duty to them is sufficient to constitute fraud. Although plaintiffs do not develop this line of analysis, presumably their argument is that, even if Dime did not actively conceal information, it nonetheless committed fraud because it owed plaintiffs a special duty of disclosure. Under this theory as well, however, "[a] plaintiff must be able

to show not only that crucial facts were withheld by defendants owing a duty of full disclosure, but also that he lacked the means to uncover these facts." *Maggio,* 824 F.2d at 131. If a plaintiff has failed to "undertake even a minimal effort to pursue the investigative opportunities available to him[, then] not even the combination of fiduciary duties and section 12 are sufficient to excuse a delay in bringing suit." *Id.* In this case, we need not determine whether Dime was a fiduciary to plaintiffs because, even if such a relationship existed, the fact remains that no revelation of information occurred subsequent to plaintiffs' discovery of negative amortization in 1988. Because plaintiffs had the "means to uncover" the relevant facts as early as 1988, and, indeed, possessed the facts themselves in 1988, their state law claim based on the existence of a fiduciary duty in combination with fraudulent concealment fails.

■ Finally, the district court dismissed one of plaintiffs' claims based on the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, on the basis that, although Dime may have been in violation of Mass. Gen. Laws ch. 167E, §§ 2(B)(9) and (10)—which prohibit the alteration of a payment amount more than once a year and the alteration of the interest rate more than every six months—plaintiffs had not alleged that Dime was subject to regulation by the Massachusetts Commissioner of Banks.[12] The court was correct. Dime, a federally-chartered bank, is regulated by the federal Office of Thrift Supervision, and DRES–MA, a non-bank subsidiary, was incorporated under New York law. The Massachusetts statutes on which plaintiffs rely apply only to Massachusetts-chartered banks. *See* Mass. Gen. Laws ch. 167E, § 1.[13]

---

12. The district court noted that plaintiffs' ch. 93A claim based on Dime's alleged violation of Mass. Gen. Laws ch. 167E § 2(B)(9) was not time-barred if the owed monthly payment amount had changed more than once during any of the four years prior to the date plaintiffs brought this action. Plaintiffs' complaint did not foreclose this issue. The court observed as well that the claim based on Dime's alleged violation of Mass. Gen. Laws ch. 167E § 2(B)(10) was not time-barred because the interest rate changed five times in 1995.

13. Plaintiffs argue in addition that DRES–MA, as a non-banking corporation, was prohibited under Mass. Gen. Laws ch. 167, § 37, from engaging in banking activity, regardless whether DRES–MA was a foreign or domestic corporation. This argument fails because DRES–MA was a *real estate* subsidiary, not a banking subsidiary. As such, although it would presently be subject to regulation under Mass. Gen. Laws ch. 255, § 2, that statute was not in force at the time plaintiffs' claims arose.

### B. Dime's Motion for Rule 11 Sanctions

Dime argues that the district court erred in denying its motion for sanctions against plaintiffs' attorneys, and that the court should have, at a minimum, conducted a hearing to determine whether plaintiffs made reasonable inquiries prior to bringing their claims.[14]

Rule 11 calls for the imposition of sanctions on a party "for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an 'improper purpose.'" *S. Bravo Sys. v. Containment Tech. Corp.,* 96 F.3d 1372, 1374–75 (Fed.Cir.1996) (citing *Conn v. Borjorquez*, 967 F.2d 1418, 1420 (9th Cir.1992)). In reviewing the district court's denial of defendant's Rule 11 motion, we apply an abuse of discretion standard. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990). As we have noted before, our review of denials of Rule 11 motions "calls for somewhat more restraint than review of positive actions imposing sanctions and shifting fees." *Anderson v. Boston Sch. Comm.,* 105 F.3d 762, 769 (1st Cir.1997). The trial judge should be accorded not only "additional deference in the entire area of sanctions," but also "extraordinary deference in denying sanctions." *Id.* at 768.

It would have been preferable for the district court to have more extensively set forth its rationale. *See Figueroa–Ruiz v. Alegria,* 905 F.2d 545, 549 (1st Cir.1990). Nonetheless, "although the rationale for a denial of a motion for fees or sanctions under Rule 11 ... should be unambiguously communicated, the lack of explicit findings is not fatal where the record itself, evidence or colloquy, clearly indicates one or more sufficient supporting reasons." *Anderson,* 105 F.3d at 769.

Here, the record contains adequate rationale for the denial of the motion. The court noted that plaintiffs' breach of contract and Massachusetts Consumer Protection Act claims were time-barred but nonetheless "colorable at least in part." Although we reiterate that district courts should provide specific findings in support of Rule 11 rulings, we conclude that, in light of the record, the court did not here abuse its discretion by holding that plaintiffs' claims were not without foundation in law or in fact.

*Affirmed.*

---

14. The district court disposed of Dime's motion in two sentences: "While I agree that the action should be dismissed, plaintiffs amended the complaint to eliminate the frivolous claims. Moreover, while the claims are time-barred, the breach of contract claims and the [Mass. Gen.] Laws ch. 93A claims were colorable at least in part."