Craig Davidson v. State of NH        CV-97-589-B    10/15/98

**UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Craig Davidson**

v.                                       Civil No. 97-589-B

**State of New Hampshire**


**MEMORANDUM AND ORDER**

On September 2, 1998, *pro se* petitioner Craig Davidson filed a motion requesting that I impose sanctions pursuant to Fed. R. Civ. P. 11 ("Rule 11") against the State of New Hampshire by and through its representative, Senior Assistant Attorney General Ann M. Rice.  In his petition, Davidson presents a laundry list of 22 separate alleged misrepresentations made in the state's answer to petitioner's writ of habeas corpus.  Davidson's allegations of misconduct by the state range from simple factual misstatements to deliberate deception and fraud on the court.  Davidson believes that these "misrepresentations," both individually and collectively, rise to the level of sanctionable conduct.

While the majority of petitioner's claims are without merit, he does highlight at least two factual inaccuracies in the state's answer to his petition for writ of habeas corpus.  These "misrepresentations," however, are nothing more than accidental, harmless errors, and do not constitute the type of offenses required to trigger Rule 11.  Accordingly, Davidson's request for sanctions is denied.

# I.  BACKGROUND

At approximately 2:15 a.m. on July 18, 1993, Craig Davidson, his wife, Gretchen Davidson, and her friend Chandra Chowanec arrived at the home of Mary Ellen and David McDuffee at 274 Edgewater Drive, Gilford, New Hampshire.  They parked Chowanec's automobile two driveways away from the residence, donned black "ninja" clothing, night vision equipment, and radio headsets, and then entered the McDuffee residence without permission.  Once inside, Craig Davidson used a stun gun on David McDuffee, Gretchen Davidson used a stun gun on Mary Ellen McDuffee, and Chowanec used a stun gun on Scott McDuffee.  This plan was carefully devised, drafted, reviewed, and executed by the Davidsons and Chowanec for the purpose of confining and terrorizing the McDuffees.  The co-conspirators met with more resistence than expected, however, and eventually, the Davidsons fled the residence to escape apprehension.  Chowanec was captured by the McDuffees inside the residence.  Tr. of Plea Hr'g, pp. 19-21.

On January 11, 1994, petitioner pled guilty to three counts of attempted kidnapping with the purpose to terrorize; one count of conspiracy to commit kidnapping; and one count of burglary.  Id. at 2-8; 26-29.  In exchange for these guilty pleas, the state agreed to enter a *nolle prosequi* on three counts of attempted murder and conspiracy to commit murder; one count of conspiracy to commit kidnapping, which alleged that petitioner acted with the purpose to murder; one count of burglary; and both counts of

a two-count indictment for criminal use of an electronic weapon. Id. at 2-8.

The plea agreement also required defendant to "give the State of New Hampshire a complete statement outlining his participation in the planning, facilitating, and execution of the events that transpired at the McDuffee residence on July 18, 1993." Letter from Michael Ramsdell, Senior Assistant Attorney General to Theodore Barnes, then-counsel for petitioner (Jan. 11, 1994). In that letter, the prosecutors made the following representation regarding the potential disclosure of petitioner's sworn statement:

> A truthful, inculpatory statement should be shielded from discovery [by co-defendants Chandra Chowanec and Gretchen Davidson] by our work product privilege . . . . However, if [the Petitioner's] statement can be deemed exculpatory for either his wife or Chandra Chowanec then . . . we will be obligated to disclose the contents of the statement to their attorneys.

Id. At the conclusion of this letter, the prosecutors requested that defense counsel notify them immediately if these terms were inconsistent with defense counsel's understanding of the agreement. Defense counsel did not contest these terms.

Petitioner provided the sworn statement prior to entering his plea on January 11, 1994. On or about January 14, 1994, defense counsel for co-defendant Chowanec filed a motion to discover the petitioner's statement. After determining that the statement contained potentially exculpatory material as defined in Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), the prosecutors released a copy of

petitioner's statement to Chowanec's defense counsel.  Counsel for petitioner was simultaneously notified of the statement's release on January 21, 1994, but failed to file any objection to the disclosure.

Upon receipt of petitioner's statement, co-defendant Chowanec moved for a hearing to determine whether petitioner would testify at her upcoming trial.  At that February 4, 1994, hearing, petitioner invoked his right against self-incrimination. Tr. of "Richards Hearing" May 13, 1994 at 3.  Chowanec then filed a motion to have petitioner immunized pursuant to N.H. Rev. Stat. Ann. § 516:34 in order to elicit his testimony as a defense witness.  The state objected, claiming that the petitioner's testimony in his sworn statement was neither "directly exculpatory," nor at "highly material variance" from the government's evidence against Chowanec, and thus did not satisfy the immunity requirements established in State v. Farrow, 118 N.H. 296 (1978), and State v. Monsalve, 133 N.H. 268 (1990).  A copy of petitioner's statement was furnished to the court, and after a second hearing and a review of petitioner's sworn statement, the court found that petitioner's testimony "would present a highly material variance from the State's evidence . . . [and that] he must be granted immunity."  Order, May 16, 1994.  Although a copy of the court's order was furnished to petitioner's counsel, no objection or request for consideration was filed.  The petitioner was never called as a witness in Chowanec's trial.

At the conclusion of petitioner's sentencing hearing on June 22, 1994, the court sentenced the him to a total of 18-36 years, with 5 years of the minimum and 10 years of the maximum to be suspended upon good behavior. Tr. of Sentencing Hr'g pp. 52-55. This sentence was well within the range specified in the plea agreement.[1]

Two years later, on June 20, 1996, petitioner, now *pro se*, filed a motion for sentence modification pursuant to N.H. Rev. Stat. Ann. § 651:20, requesting that the remainder of his sentence be suspended, deferred, or restructured. The state objected, and New Hampshire State Prison Warden Michael Cunningham filed a summary of the petitioner's activities, and despite noting that the petitioner had "done well to date," he concluded with the statement: "I do not recommend a sentence modification."

The court held a sentence modification hearing on November 15, 1996. In the five months between his petition for sentence modification and the hearing, petitioner filed at least eight other pleadings, including five separate motions for injunctive relief, a motion for summary judgment, a motion for compensatory damages, and a motion for punitive damages. These pleadings raised two clear claims: (1) that the state violated the terms of

---

[1] Pursuant to the plea agreement between petitioner and the state, at the sentencing hearing, the state was arguing for a minimum sentence of 15 years and a maximum of 40 years, while the petitioner was arguing for a minimum of 5 years and a maximum of 15 years.

the plea agreement by releasing a copy of petitioner's statement to Chowanec without first seeking a judicial determination that the statement was discoverable because it contained exculpatory material; and (2) that the state failed to uphold its end of the plea agreement by sending copies of the petitioner's dismissed indictments to the prison system. Pursuant to these two claims, petitioner asked the court to (a) vacate the plea agreement and order petitioner's immediate and unconditional release from custody; (b) issue a cease-and-desist order prohibiting the state from maintaining copies of dismissed indictments in a prisoner's file; (c) issue contempt citations against then-Attorney General Jeffrey Howard and the attorneys who prosecuted the case and initiate disciplinary proceedings against them; and (d) order the expungement of petitioner's criminal record. The state objected, asserting *inter alia*, that the petitioner's claims exceeded the proper scope of a sentence modification hearing, and were the proper subject matter for a state habeas petition.

At the November 15, 1996, sentence modification hearing, the state renewed its objection to the court's consideration of any motion other than the request for sentence modification. In light of the petitioner's *pro se* status, however, and because the petitioner had subpoenaed two prison officials to the hearing to testify about matters related to the state's alleged breach of the plea agreement, the court entertained these extraneous issues. Cindy Belanger, the Administrator of Offender Records at the New Hampshire State Prison, testified that she made an

-6-

erroneous handwritten notation describing the nature of the petitioner's convictions in the margin of a document in his prison record. This "shorthand" description mistakenly noted that the offenses of conspiracy to commit kidnapping and attempted kidnapping were committed with the purpose to murder (as was alleged in the *nol prossed* Count I of each two-count indictment), rather than with the purpose to terrorize (as alleged in Count II of each indictment and agreed to in the plea agreement). While these notations served as a quick reference to the underlying charges, the official documents remained in the record, and the inclusion of the inaccurate notations did not result in any adverse consequences to the petitioner. Belanger testified that petitioner's status as a medium-security inmate would not have changed, and his privileges and access to educational and vocational opportunities, medical and mental health treatment, and other prison programs would not have been any different had her notations been accurate. See Mot. Hr'g pp. 77-79.

The court denied petitioner's motion for sentence modification, denied petitioner's request for money damages without prejudice, and requested that the state submit additional pleadings on the two clear issues noted above: (1) whether the state violated the plea agreement by releasing the petitioner's statement to Chowanec's counsel; and (2) whether the Department of Corrections violated the plea agreement by inaccurately reflecting the convictions in the petitioner's prison record.

See id. at 114-120.  The court then issued a written order

denying petitioner's requests for injunctive relief except that, to the extent that the prison records inaccurately reflected the petitioner's convictions, the Department of Corrections was ordered to correct these records. The court also made an express finding that Belanger's inaccurate notations "in no way affected the classification of the [Petitioner] or in any way limited his progress within the State Prison system." Order, November 15, 1996.

Pursuant to the court's request, the state filed a written pleading addressing the two issues identified above. Petitioner responded by filing seven additional motions, including motions for contempt, motions to reverse for clear error, motions to subpoena evidence, and another motion for summary judgment. On April 17, 1997, the court issued a written order responding to all pending motions. This order held that the state did not violate the plea agreement with petitioner, as the agreement did not require the state to get a judicial determination of the exculpatory nature of the petitioner's statement before releasing it to counsel for co-defendant Chowanec. The court noted further that even if the disclosure did violate the plea agreement, given that the court subsequently determined that the statement was "directly exculpatory" to co-defendant Chowanec, petitioner suffered no adverse consequences from its release.

The court also rejected the petitioner's second claim that the state, through the Department of Corrections, violated the plea agreement by "reinstating" *nol prossed* indictments. In

denying this claim, the court held that the inaccurate notations in the prison file were made inadvertently and without bad faith on the part of any state actor, and caused no adverse consequences to the petitioner. All other motions by the petitioner were denied.

In June 1997, petitioner filed a notice of appeal with the New Hampshire Supreme Court raising 25 separate issues pertaining to the proceedings in the lower court. In the interim, on November 17, 1997, petitioner filed a writ of habeas corpus with this court, claiming that the New Hampshire Supreme Court's five-month delay in ruling on his appeal demonstrated the unavailability or ineffectiveness of state corrective processes. Although petitioner's notice of appeal before the New Hampshire Supreme Court was declined on December 18, 1997, he failed to bring that declination order to this court's attention. Consequently, I denied petitioner's federal writ of habeas corpus for failing to exhaust state remedies on March 5, 1998. I did so in light of clear First Circuit and Supreme Court precedents demonstrating that a delay of several months in the highest court of a state is not enough to demonstrate the unavailability or ineffectiveness of state corrective processes to excuse a failure to exhaust state remedies.[2]

_____

[2] See, e.g., Castille v. Peoples, 489 U.S. 346, 349-51 (1989)(reconciling the exhaustion requirement with the availability of habeas relief when state corrective processes are ineffective); Odsen v. Moore, 445 F.2d 806, 807 (1st Cir. 1971)(per curiam)(finding a three-year delay sufficient to set aside the exhaustion requirement).

In light of the New Hampshire Supreme Court's declination order, my order was vacated by the First Circuit Court of Appeals on June 11, 1998. Consequently, the First Circuit remanded the case here for further proceedings.

## II.  FACTS

Petitioner, in his motion for Rule 11 sanctions, presents 22 allegedly sanctionable misrepresentations in the state's answer to his federal writ of habeas corpus. Many of these claims are completely without merit,[3] while others raise only semantic differences between the record and the state's answer.[4] In the

---

[3] For example, petitioner cites the state's error in recounting the exact procedural history of the case as a misrepresentation worthy of Rule 11 sanctions. In paragraph 17 of its answer, the state notes that "[t]he Petitioner appealed to the First Circuit. . . . [and] [w]hile the appeal was pending, the N.H. Supreme Court issued its declination order. . . ." In fact, the supreme court issued the declination order on December 18, 1997. Because I was never notified of this disposition and thought the appeal was still pending before the supreme court, I dismissed petitioner's original habeas petition for failure to exhaust state remedies on February 4, 1998. The notice of appeal to the First Circuit was not filed until March 14, 1998. Consequently, the case had already been declined by the New Hampshire Supreme Court when petitioner's appeal to the First Circuit was made. The state's unintentional chronological misstatement of this tangled procedural history, however, has no bearing, and is of absolutely no consequence to petitioner's renewed, viable writ.

[4] For example, petitioner cites as a "sanctionable" misrepresentation, the state's assertion that "Warden Cunningham filed a synopsis of the Petitioner's activities and conduct while in prison, and recommended that the request for clemency be *denied*." State's Answer to Writ of Habeas Corpus at 5 (emphasis added). In his report, Cunningham actually used the words "I do not recommend a sentence modification." Petitioner claims that "[n]ot recommending a modification is a long way from recommending [the request for sentence modification] be declined."

interest of efficiency, I narrow the field to a discussion of the petitioner's best claims.

A.   <u>**Omission of Dropped Indictments**</u>

Petitioner alleges that paragraph one of the state's answer, discussing charges against the petitioner which were dropped at the plea hearing, fails to add that the attempted murder and conspiracy to commit murder indictments against petitioner were also dropped.  Petitioner asserts that this constitutes a "false or fraudulent statement" lacking evidentiary support.

B.   <u>**"The Terms as Written"**</u>

In addressing the terms of the plea bargain, petitioner challenges the state's assertion that "[d]efense counsel did not contest the terms as written."  State's Answer to Pet. for Writ of Habeas Corpus at 3 (document no. 21).  Petitioner alleges that this statement is false because a reference to a .45-caliber handgun was struck from petitioner's sworn statement by the terms of defense counsel's counteroffer in plea negotiations.

C.   <u>**Release of "Exculpatory" Statement**</u>

With respect to the release of his sworn statement to co-defendant Chowanec's counsel, petitioner challenges as fraudulent the state's argument that the statement was provided to co-defendant's counsel because it was exculpatory.  Petitioner supports this claim by referring to the state's later argument at the <u>Richards</u> hearing that this statement was "not exculpatory."

## D.    Voluntariness of the Plea

Petitioner also alleges that the state has perpetrated a "direct fraud" on the court by stating, in paragraph 26 of its answer, that petitioner "has never challenged the voluntariness of his plea." Petitioner, citing Machibroda v. U.S., suggests that his repeated allegations that the state violated his plea agreement constitutes a challenge to the voluntariness of that plea. See 82 S.Ct. 510, 517 (1962) (stating that "[a] guilty plea, if induced by promises . . . which deprive it of the character of a voluntary act, is void . . . .").

## E.    Petitioner's Failure to Provide Facts

Finally, petitioner repeatedly challenges the state's claims that he failed to provide facts to support his habeas petition. Petitioner points to the "Statement of Stipulation of Facts" which he wrote and filed with the First Circuit on April 20, 1998. This statement, containing 81 "factual" statements, however, was never stipulated to, adopted, or signed by the state, and was not included with the original petition for habeas corpus relief.


## III. DISCUSSION

## A.    The Standard

The Federal Rules Advisory Committee states, in the 1993 Amendments to Rule 11, that "attorneys and pro se litigants have an obligation to the court to refrain from conduct that frustrates the aims of Rule 1" to provide a "just, speedy, and

-13-

inexpensive determination of every action." Fed. R. Civ. P. 11 advisory committee note (1993); Fed. R. Civ. P. 1. Rule 11 states, in pertinent part,

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, - it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay . . . the allegations and other factual contentions have evidentiary support . . . and the denials of factual contentions are warranted on the evidence . . . If, after notice and a reasonable opportunity to respond, the court determines that [any of the above] provisions has been violated, the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties . . . responsible for the violation . . . . A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated.

Fed. R. Civ. P. 11. The continuing purpose of Rule 11, then, is "to deter dilatory and abusive tactics in litigation and to streamline the litigation process by lessening frivolous claims or defenses." Cruz v. Savage, 896 F.2d 626, 630 (1st Cir. 1990).

According to the Supreme Court, "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable and not 'interposed for any improper purpose.'" Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990). In the First Circuit, attorneys are held to the standards of due diligence and objective reasonableness under the circumstances that existed when the papers were filed. See Mariani v. Doctors Assoc., Inc., 983 F.2d 5, 7 (1st Cir.

-14-

1993); <u>Navarro-Ayala v. Nunez</u>, 968 F.2d 1421, 1425 (1st Cir. 1992). Rule 11 sanctions should be imposed on a party only "for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an 'improper purpose.'" <u>Salois et. al. v. The Dime Sav. Bank of New York</u>, 128 F.3d 20, 28 (1st Cir. 1997)(quoting <u>S. Bravo Sys. v. Containment Tech. Corp.</u>, 96 F.3d 1372, 1374-75 (Fed. Cir. 1996)). The rationale for a denial of Rule 11 sanctions should be "unambiguously communicated." <u>Anderson v. Boston Sch. Comm.</u>, 105 F.3d 762, 769 (1st Cir. 1997).

## B. <u>Davidson's Allegations</u>

### 1. Omission of Dropped Indictments

The record supports petitioner's allegation that the state, in discussing the plea agreement with the petitioner, failed to mention that the attempted murder and conspiracy to commit murder indictments against him were dropped. This omission, however, occurred in a section of the state's answer clearly marked "Procedural History" and played no additional role in the state's argument. Additionally, the paragraph where the omission occurred cites to the record of the hearing where a full accounting of the dismissed charges, including those omitted in the state's answer, is made.

### 2. "The Terms as Written"

Discussing his plea agreement, petitioner challenges the state's assertion that "[d]efense counsel did not contest the terms as written," alleging that this statement is false because

a reference to a .45-caliber handgun was struck from petitioner's sworn statement during the plea negotiations. A careful examination of the context of the state's assertion, however, reveals that "the terms as written" does not refer to the content of the sworn statement, but to the "terms" of the representation regarding *disclosure* of that statement that prosecutors made in their January 11, 1994, letter to petitioner's then-counsel. In that letter, the prosecutors, discussing the possible disclosure of the statement, stated:

> A truthful, inculpatory statement [by Petitioner] should be shielded from discovery [by co-defendants Chandra Chowanec and Gretchen Davidson] by our work product privilege . . . . However, if [the Petitioner's] statement can be deemed exculpatory for either his wife or Chandra Chowanec then . . . we will be obligated to disclose the contents of the statement to their attorneys.

Immediately following this quote in the state's answer, the Senior Assistant Attorney General states, "The prosecutors requested that defense counsel notify them if the stated terms were inconsistent with his understanding of the agreement. Defense counsel did not contest *the terms* as written." Answer p. 3 (emphasis added). It is apparent that "the terms" the state references in its answer are the terms of this disclosure statement in the January 11 letter. Since defense counsel did not contest these terms, the state's assertion is, in fact, accurate.

### 3.    Release of "Exculpatory" Statement

With respect to the release of his sworn statement to co-defendant Chowanec's counsel, petitioner challenges as fraudulent the state's argument that the statement was provided to co-defendant's counsel because it was exculpatory.  Petitioner supports this claim by noting that less than two months later, at the <u>Richards</u> hearing on February 4, 1994, the state argued that this same sworn statement was "not exculpatory."  The explanation for this perceived contradiction, however, lies in the fact that two different standards govern prosecutors' treatment of potentially exculpatory evidence.

Pursuant to the <u>Laurie</u> decision, New Hampshire criminal defendants "have an explicit right 'to produce all proofs that may be favorable to [them].'"  <u>New Hampshire v. Laurie</u>, 139 N.H. 325, 329 (1995)(quoting N.H. Const. pt. I, art. 15).  As a practical matter, since the prosecutor alone decides which information must be disclosed to a defendant, the New Hampshire Supreme Court has erected significant safeguards against prosecutorial misconduct in this area.  In establishing the standard for initial disclosure of exculpatory material, the court has stated that "essential fairness . . . underlies the duty to disclose," <u>id.</u> (quoting <u>State v. Dukette</u>, 113 N.H. 472, 476 (1973)), and that "[u]pon a showing by the defendant that favorable, exculpatory evidence has been knowingly withheld by the prosecution, the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have

-17-

affected the verdict."  Id.

The purpose of this mechanism is to assure that criminal defendants have fair access to evidence instrumental in their defense.  Accordingly, prosecutors can be expected to apply a rather liberal eye in evaluating potentially exculpatory evidence at this initial stage of the proceedings.

By seeking sanctions against the state for later arguing, in the Richards hearing,[5] that the sworn statement they released was "not exculpatory," petitioner attempts to use the Laurie standard to trap the state in a Catch-22.  Petitioner argues that since the state released the statement because it was potentially exculpatory, it is barred from later arguing that the same evidence is, in fact, not exculpatory - and its attempt to do so is fraudulent and deserving of sanctions.  Such a perversion of the Laurie mechanism is clearly contrary to the policy rationale underlying the decision.  It is sufficient, for the purposes of this order, to note that two different standards govern exculpatory evidence.  The liberal standard for the initial

_____

[5] In the Richards hearing in co-defendant Chowanec's case, petitioner invoked his Fifth Amendment rights against self-incrimination.  Co-defendant Chowanec's counsel then sought to compel the state to grant use and derivative use immunity to petitioner in order to elicit his allegedly exculpatory testimony.  The state then argued that Petitioner's sworn statement did not contain testimony that "would be directly exculpatory and at material variance" from the evidence already available in Chowanec's case.  In the hearing itself, the state made the distinction at issue here - the distinction between the initial evaluation of potentially exculpatory evidence, and the later evaluation of whether that evidence was "directly exculpatory and at material variance" for purposes of its later use.  See Tr. of Richards Hr'g pp. 4-8.

-18-

evaluation of potentially "exculpatory" evidence endorsed by <u>Laurie</u> for the purpose of protecting defendants' access to evidence does not bind the state to that conclusion with respect to subsequent issues involving that evidence. The state is free to release potentially exculpatory evidence to comply with <u>Laurie</u>, and later argue against its characterization as such. The state has committed no fraud in arguing accordingly.

**4.    Voluntariness of the Plea**

Petitioner also alleges that the state has perpetrated a "direct fraud" on the court by stating, in paragraph 26 of its answer, that petitioner "has never challenged the voluntariness of his plea." Petitioner, citing <u>Machibroda v. U.S.</u>, suggests that his repeated allegations that the state violated his plea agreement constitutes a challenge to the voluntariness of that plea. <u>See</u> 82 S. Ct. 510, 517 (1962) (stating that "[a] guilty plea, if induced by promises . . . which deprive it of the character of a voluntary act, is void . . . .").

Here, the dispute centers on the meaning of the word "voluntary." The state adopts the traditional understanding of voluntariness, interpreting the term to indicate a plea made without coercion or compulsion. By citing <u>Machibroda</u>, petitioner endorses the same position. In <u>Machibroda</u>, the defendant's plea was flagrantly coerced by an assistant United States attorney who, on three separate occasions, promised the defendant reduced sentences in exchange for that plea, and then tried to bribe the defendant to keep the agreement secret. <u>See</u> <u>Machibroda</u>, 82 S.Ct.

at 511. While I make no ruling on the actual voluntariness of petitioner's plea at this time, I do find that the state is on firm ground in stating that petitioner has never claimed that his pleas were elicited through the kind of coercion and deception illustrated by Machibroda. The state has committed no fraud in making this claim.

### 5. Petitioner's Failure to Provide Facts

Finally, petitioner repeatedly challenges the state's claims that he failed to provide facts to support his habeas petition. Petitioner points to the "Statement of Stipulation of Facts" which he filed with the First Circuit on April 20, 1998. This statement, containing 81 "factual" statements, however, is entirely the petitioner's creation. It was never stipulated to, adopted, or signed by the state, and was not included with, or attached to the original petition for habeas corpus. While I may consider that statement of facts as part of the petitioner's habeas petition in the interest of efficiency, I will not impose sanctions on the state for its accurate claims that the petitioner failed to include sufficient facts with his habeas petition.

This dispute, like most of the disputes discussed above, arises because the *pro se* petitioner is understandably unfamiliar with pleadings practice. While I have done my best to follow the unmarked trail through the mountains of pleadings the petitioner has generated, I find no cause to sanction the state for its unwillingness to make that journey itself.

-20-

## C.  **Summary of Findings**

I have pored over petitioner's complaint with the utmost care.  Because he is *pro se*, I have searched the record thoroughly for proof to support his often obfuscatory allegations.  Although in a few instances discussed cited above, petitioner has pointed out errors in the state's recitation of the record, Rule 11 sanctions are properly triggered only by claims or arguments which are "frivolous, legally unreasonable, without factual foundation, or asserted for an 'improper purpose.'"  Salois et. al., 128 F.3d at 28.

According to the Advisory Committee,

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading . . .; whether it was intended to injure; what effect it had on the litigation process in time or expense; . . . all of these may in a particular case be proper considerations.  The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct . . . .

Fed. R. Civ. P. 11 advisory committee's note (1993).  Unintentional or accidental factual misstatements, particularly those made in reference to a lengthy and confusing record and in response to a vague *pro se* habeas petition, simply do not rise to the level of sanctionable conduct under Rule 11.

Given that the purpose of Rule 11 sanctions is "to deter rather than to compensate," id., I find that imposing sanctions

-21-

against the state in this case, where the few misrepresentations that were made were clearly both unintentional and inconsequential to petitioner's pending writ, would not support that purpose.

## IV. CONCLUSION

"Rule 11 motions should not be made or threatened for minor, inconsequential violations . . . ." Id. There is nothing in the record to indicate that petitioner's few meritorious allegations of misstatements by the state are anything more than that. Accordingly petitioner's motion for sanctions (document no. 22) is denied.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 15, 1998

cc: Craig Davidson, pro se
    Ann Rice, Esq.